Harllel B. JONES, Petitioner,

v.

A. R. JAGO, Superintendent of the Southern Ohio Correctional Facility, Respondent.

No. C75–530.

United States District Court, N. D. Ohio, E. D.

Feb. 10, 1977.

Gary T. Kelder, Syracuse, N. Y., Gordon S. Friedman, Cleveland, Ohio, Richard L. Aynes, Akron, Ohio, for petitioner.

Simon B. Karas, Asst. Atty. Gen., Columbus, Ohio, for respondent.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Harllel Jones, the petitioner herein, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His initial petition stated nine separate grounds for the issuance of the writ. In response to pleadings filed by the respondent, this court entered an order on November 7, 1975 dismissing most of the grounds stated therein, but ruling that an evidentiary hearing was necessary as to the following three contentions:

1. That the petitioner was denied due process of law by virtue of the state's suppression of an exculpatory statement from one Victor John Harvey.

2. That the petitioner was denied due process by the State's failure to disclose a promise of leniency made to Robert Perry, the State's key witness.

3. That the petitioner was denied due process and his right to effective counsel by the involvement of Robert Perry and his counsel in the strategy and planning councils of the defense.

The evidence presented at this hearing raised substantial constitutional questions with regard to each of these contentions. The petitioner's most compelling argument, however, concerns the failure of the state to divulge the pretrial statement made by Victor Harvey. Since the court is compelled to find, for the reasons stated below, that the petitioner's constitutional right to a fair trial has been violated by the State's suppression of this evidence, it is unnecessary to reach the other issues raised by the petitioner.

The petitioner was indicted along with Marvin Bobo, Victor Harvey, James Moore and Robert Perry on October 1, 1971 and charged with murder in the first degree and with shooting with intent to kill or wound, in connection with the killing of John Howard Smith and the wounding of Harlowe Tate which occurred on August 7, 1970. He was convicted on March 28, 1972 of second degree murder and shooting with intent to kill or wound and sentenced to an indeterminate life sentence and a concurrent sentence of one to twenty years, which he is currently serving.

The State's theory in its prosecution of the petitioner was based on the liability of an aider and abettor as provided in O.R.C. § 1.17. The State alleged that on the evening of August 6, 1970, the petitioner, as leader of an organization called the Afro Set, called a "red alert" meeting of the Afro Set and ordered its members to shoot police officers and security guards randomly in retaliation for the fatal shooting of one Willie Lofton, an Afro Set member, by a security guard. The State contended that, pursuant to these orders, Afro Set members Marvin Bobo, James Moore, Victor Harvey and Robert Perry, riding together in Marvin Bobo's automobile, committed the shootings in question in the early morning of August 7, 1970. The State's case rested principally upon the testimony of Robert Perry, who had become a confidential F.B.I. informant a few months prior to the petitioner's trial. His testimony was the key evidence linking Afro Set members with the shootings of August 7 and establishing that those members were acting at the petitioner's directions.

Victor Harvey was a participant in the shootings and, at the age of 15, one of the original defendants in this case. The charges against him in this case were, however, ultimately dropped by the State. While in custody at the Juvenile Detention Home, Victor Harvey was questioned by and made a statement to the Cleveland Police. The written portion of this statement, typed by a member of the Cleveland Police and signed by Victor Harvey, is an account of events of the night in which the shootings occurred. Victor Harvey states therein that he heard of the killing of Willie Lofton at McDonalds restaurant at the Afro Set Headquarters after a phone call came in to the shop; that he went to McDonalds with the others at the shop; that he then rode to 55th street with Marvin Bobo, who parked his car on Authwaite; that he waited near the car while Bobo walked toward 55th street; that he saw a shotgun in the trunk of Bobo's car while at 55th street; that Bobo returned with James Moore and Robert Perry; and that all four left in Bobo's car. The statement continues to recount a series of shooting incidents, which include those involving John Howard Smith and Harlow Tate, committed that night by these four individuals. Nowhere in the statement is there any mention made of a meeting at the Afro Set Headquarters or of any directions issued by Harllel Jones. Indeed, there is no mention of Harllel Jones at all in the written statement except the identification of his picture, which is made by Victor Harvey.

The petitioner contends that Victor Harvey was questioned by the police at the time the statement was taken as to the involvement of Harllel Jones and that Harvey orally stated that Jones had neither called an alert nor had any prior knowledge of the killing. No such questioning or statements concerning Jones' involvement appear on the face of the written statement. The petitioner's contention is supported by the testimony of Victor Harvey and his step-father, who was present when the statement was made. The state argues to the contrary that Victor Harvey made no such statement concerning Harllel Jones and that, indeed, he had prefaced his statement with the qualifying remark that he would not comment on any involvement of Harllel Jones. This question of fact is one which cannot be confidently decided on the basis of the evidence received. Analysis of the materiality of the written statement as it appears on its face, however, renders it ultimately unnecessary to resolve this factual dispute.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In *Moore v. Illinois*, 408 U.S. 786, 794–795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) the Supreme Court stated:

> The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

It is undisputed that the defense made a specific request for the production of Victor Harvey's statement. The state contends, however, that the statement which it received from Victor Harvey was neither favorable to the defense nor sufficiently material to compel production under *Brady*.

In the state's case in chief, Robert Perry testified that Victor Harvey was at the "red alert" meeting at which Jones ordered the killing and that at that meeting Harllel Jones gave Victor Harvey a shotgun with which to carry out this order. The state contends that since Victor Harvey's written statement does not expressly deny that such a meeting took place or that he received a shotgun from Jones, it cannot be construed as favorable to the petitioner. But, while it is true that the statement is

not unambiguous, the failure to mention any involvement of Harllel Jones must certainly be construed as at least "favorable" to the defense. Harvey's statement, after all, gave a fairly detailed account of the events of the night. To the question, "Is there anything else you can tell us about the murder?", Harvey answered "No." The statement would seem, then, to indicate by omission that Harvey did not attend a red alert meeting that night. Harvey, furthermore, stated at one point within his narrative that "I saw a shotgun in the trunk of Bobo's car." This statement seems on its face to indicate that Harvey saw the shotgun for the first time in Bobo's trunk and, hence, that he was not given the gun by Jones. Though the ambiguous nature of the statement could have limited its evidentiary impact had it been introduced at trial, the statement appears on its face to be favorable to the defense.

The harder question is whether the statement is, in view of its ambiguities and omissions, sufficiently material to compel disclosure. The Supreme Court noted in *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976), that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." Certainly the failure to disclose evidence which, although "favorable" for the defense, is so insubstantial that it could not possibly have affected the outcome would not constitute a constitutional violation.

In *Agurs*, the Supreme Court established the standard of materiality to be applied to evidence which has not been specifically requested by the defense. The court held that a defendant's constitutional rights have been violated if it can be concluded after examining the entire record that the undisclosed evidence "creates a reasonable doubt that did not otherwise exist." *Id.*, 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355. The court was, however, careful to note that this standard of materiality was "not necessarily the same" as that which should be applied in cases where the undisclosed information was specifically requested. The court did not attempt to define the applicable standard of materiality in such cases but clearly indicated that a lesser showing of materiality would be required:

> In *Brady* the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor received a specific and relevant request, the failure to make any response is seldom, if ever, excusable. *Id.*, 427 U.S. at 106, 96 S.Ct. at 2398, 49 L.Ed.2d at 357.

Thus, even if the definition of materiality is not changed where a specific request has been made, the Court suggests here that the burden of proving materiality should be diminished in those instances, since disclosure should be required even if there is only a "substantial basis" for claiming materiality.

The distinction suggested in *Agurs* between cases where the omitted evidence was the subject of a specific request and cases where it was not specifically requested reflects the exigencies of the prosecutor's circumstances. The prosecutor cannot generally be expected to be sufficiently familiar with the case for the defense to be able to anticipate which information in his file is important to the defense without a specific request. As Judge Friendly noted in *United States v. Keogh*, 391 F.2d 138, 147 (2d Cir. 1968), a specific request "serves the valuable office of flagging the importance of the evidence for the defense." It should be noted that in this case the prosecution had considerable notice of the importance of the statement of Victor Harvey to the defense. A specific request for the statement was made once at a pre-trial hearing and again at the beginning of the trial. The defense, indeed, requested the opportu-

nity to question Lieutenant Fuerst under oath as to the existence of an exculpatory statement, but this request was successfully resisted by the prosecution.

The minimum standard of materiality to be applied in a case such as this has not yet been defined by the Supreme Court. It may be noted that other courts have in the past applied standards of materiality both in cases where there was and was not a specific request made for the omitted evidence which are less restrictive than that defined in *Agurs*. Courts of Appeal have held, for instance, that where the suppression was unintentional the test of constitutional error is "[whether] there is a 'significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.' " *e. g. United States v. Morell*, 524 F.2d 550, 553 (2d Cir. 1975); *Ogden v. Wolff*, 522 F.2d 816, 822 (8th Cir. 1975); *Shuler v. Wainwright*, 491 F.2d 1213, 1223 (5th Cir. 1974). If the suppression of evidence of known value to the defense was "intentional", it has been held that a new trial is warranted if the evidence is "merely material or favorable to the defense" *e. g. United States v. Morell*, 524 F.2d 550, 553 (2nd Cir. 1975). Indeed, courts have stated that "In cases involving the deliberate suppression of exculpatory evidence the courts will not inquire into the elusive question of actual prejudice." *United States v. Harris*, 462 F.2d 1033, 1035 (10th Cir. 1972), quoted in *Shuler v. Wainwright*, 491 F.2d 1213, 1223 (5th Cir. 1974).

Under the circumstances of this case, however, it is unnecessary to determine the minimum standard of materiality which must be met to merit a new trial. It is clear to the court that the petitioner has successfully demonstrated that there is at least a "substantial basis" for the claim that the omitted evidence creates a reasonable doubt as to guilt which did not otherwise exist. The opinion in *Agurs* indicates that, while a lower standard may be acceptable, a greater showing of materiality than this should not be required where the omitted

evidence was specifically requested. And, certainly, in meeting this test, the various other standards mentioned above are also satisfied.

The importance of this statement to the defense must be evaluated within the context of the trial record. Harllel Jones was convicted primarily on the testimony of Robert Perry. Perry testified that Jones, as leader of the Afro Set, called a "red alert" meeting after the shooting of Willie Lofton, an Afro Set member. At this meeting, according to Perry's testimony, Jones ordered Afro Set members to retaliate for the death of Lofton by shooting security guards or police. Perry also stated that Jones gave Victor Harvey a Shotgun at this meeting. Kenneth Malone, who was also an Afro Set Member, appeared as a rebuttal witness for the State and substantially confirmed Perry's testimony.

The defense, on the other hand, also put two Afro Set members on the stand, both of whom testified to the contrary that there was no alert meeting called that night. Marvin Bobo, who had already pleaded guilty to this murder, testified that he and the others riding in his car undertook the retaliatory killing without the authorization or knowledge of Harllel Jones. Bobo also stated that he gave Victor Harvey a shotgun from the trunk of his car.

The case against Harllel Jones was, then, clearly far from overwhelming. The testimony was conflicting and its resolution depended entirely on the jury's evaluation of the credibility of the witnesses. Furthermore, the credibility of the state's principal witness was at least open to attack, since he was himself directly involved in the killing and had been a paid FBI informer prior to the trial.

The impact of Victor Harvey's statement would, of course, have depended upon the manner in which the jury resolved its ambiguities. If the jury interpreted the statement, as the state argues it should, as suggesting nothing as to the involvement or non-involvement of Harllel Jones, then, of course, it could have been of no value to the petitioner. But if the jury interpreted the

statement, as appears more reasonable, to suggest that there was no alert meeting and that Harvey did not receive the shotgun from Jones, it would have been of some use to the petitioner. And, of course, if the jury relied on this interpretation and found the statement credible, the petitioner would have been exonerated.

The use of Victor Harvey's statement as evidence at trial would have required Victor Harvey to take the stand to affirm it as his own. The evidentiary weight of the statement would have depended not only upon its written content but upon any oral testimony which Victor Harvey might have given in explaining its ambiguities and omissions. Victor Harvey has stated to this court that he would have testified that there was no red-alert meeting the night of the shooting and that, as Marvin Bobo also testified, he received the shotgun from the trunk of Bobo's car and not from Jones. Since Victor Harvey has also indicated to the defense investigator before the trial began that he would testify in Jones' favor, there is good reason to believe that this would have been the substance of his testimony. With such supporting testimony clarifying the ambiguities and omissions in the written statement, it appears clear that this evidence might have affected the outcome of the trial considering the balance of the other evidence. The jury might still, of course, have chosen to disbelieve Victor Harvey and found the petitioner guilty, but the evaluation of credibility should, in this instance, be the province of the trial jury and not this court. It is sufficient that we find that there is a "substantial basis" for the claim that the undisclosed evidence raises a reasonable doubt as to guilt. Certainly a statement by a direct participant in the killing which can be reasonably interpreted in such a way as to negate guilt, or at least cast considerable doubt on the reliability of the state's principal witness, must, in the circumstance of this case, be regarded as sufficiently material to compel disclosure.

It should be noted that the State has argued further that the statement should not be considered material because Victor Harvey was himself freely available to the defense and had, indeed, given a substantially similar statement to the defense. The defense, according to the State's view, had the full opportunity to present Victor Harvey's testimony but failed to make use of it. But, in fact, the defense was restrained from using Harvey as a witness by the fear that Harvey had made a statement incriminating the petitioner. This fear was generated by the State's own actions—particularly its failure to disclose Harvey's statement—and certainly was not, under the circumstances, irrational. Despite the fact that Victor Harvey was a direct participant in the killing, the charges against him had been dropped and he had been declared a material witness for the state. Before the trial began, the defense, which had no knowledge of Perry's eventual testimony, naturally suspected that Harvey would be a witness for the State. The defense was aware that Harvey had given a statement to the police and assumed that if it was, as Harvey had told them, exculpatory, it would be given to them upon their request to the State. After the State repeatedly denied that it had exculpatory evidence from Harvey, the defense had good reason to suspect that Harvey had implicated Jones in his statement. This suspicion was reinforced by the conduct of Robert Perry, who had likewise told the defense investigator before the trial that Jones was not involved in these crimes but then testified against Jones during the trial. Though Harvey was never called as a witness for the State, the risk that he had incriminated Jones in his statement to the police thus appeared to the defense counsel to be too great to allow him to take the stand.

The harm caused by the State's failure to disclose Victor Harvey's statement is not, then, mitigated by Harvey's availability as a witness and apparent willingness to testify for the defense, but, in fact, considerably aggravated. By withholding the statement the State not only denied the defense the use of the statement itself but effectively prevented the defense from using Victor Harvey as a witness. In view of the insis-

tent requests by the defense for exculpatory statements by Victor Harvey, it is, indeed, somewhat difficult to believe that the state was unaware of the dilemma it had created for the defense. But it is unnecessary for the court to decide if the State's conduct was, as the petitioner complains, deliberately calculated to discredit the reliability of Victor Harvey as a defense witness. It is, at any rate, clear that this was the effect of the State's actions. The State cannot, therefore, be permitted to argue now that its failure to disclose Harvey's statement could not have prejudiced the defense.

In view of the substantial criminal activity attributed by the police to the Afro Set in the often turbulent years preceding the petitioner's arrest, the apparent over-zealousness of the State in pursuit of the petitioner's conviction is, at least, understandable. The State must, however, be reminded that, as Justice Fortas stated,

A criminal trial is not a game in which the State's function is to outwit and entrap its quarry. The State's pursuit is justice, not a victim. *Giles v. Maryland*, 386 U.S. 66, 100, 87 S.Ct. 793, 810, 17 L.Ed.2d 737 (1966).

This court is charged with the duty of assuring that no citizen, whatever his associations, is deprived of his liberty without a constitutionally fair trial. Accordingly, the writ shall issue and the petitioner shall be released unless within 90 days of this order the State begins new trial proceedings against him.

IT IS SO ORDERED.